UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

ANGELA HAMILTON,

                         Plaintiff,

       - against -

INTERCOS AMERICA, INC.,

                       Defendant.

------------------------------------------------------------X

06 Civ. 13724 (SAS)

**DEFENDANT'S
STATEMENT
PURSUANT TO
LOCAL CIVIL RULE 56.1**

Defendant, Intercos America, Inc. ("Intercos" or the "company"), by its

attorneys, Kauff McClain & McGuire LLP, respectfully submits this Statement Pursuant

to Rule 56.1 of this Court's Local Civil Rules in support of its motion for summary

judgment.  The following are material facts as to which there is no genuine issue to be

tried.[1]

## Intercos and the Industry It Is Engaged in

      1.        Intercos is located in Congers, New York, in Rockland County.  It is

in the business of producing cosmetics, primarily lipsticks and powders, that are sold

under brand names by its customers (*e.g.,* Revlon, L'Oreal, Mary Kay).  It is the

American subsidiary of Intercos SpA, an Italian corporation that has manufacturing

facilities in Italy, Switzerland, Malaysia, and China, as well in Congers.  It maintains a

---

[1]   Defendant's motion and this Statement Pursuant to Local Civil Rule 56.1
assume *arguendo* that plaintiff's allegations are true, even though defendant disputes
many of those allegations.  Hence, defendants should not be deemed to stipulate that
the statements contained herein are true, and reserve the right to contest them at trial if
its motion is denied.

sales office on 57th Street in New York City. (Affidavit of Morena Genziana, sworn to December 8, 2007 [herein "Genziana aff't"] ¶ 2.)

2.      Intercos started operations in Congers in 2000, and remained in rapid-growth, start-up mode for several years.  Its revenues did not exceed its costs until 2004, the year Morena Genziana became the General Manager of the company. (Genziana aff't ¶ 3.)

3.      The production process at Intercos starts with the identification and procurement of the raw materials that go into the product.  This includes the selection of, and negotiation of prices with, the vendors who sell these ingredients, as well as ordering, shipping, and receiving the ingredients at the company's warehouse.  The ingredients are weighed, bundled, and combined in prescribed proportions, and then refined to the required consistency.  After passing quality control tests and inspections, the material is pressed into individualized "pans" (for powders) or cylinders (for lipsticks) that are ready to be packaged for sale to consumers.  Sometimes the "pressed pans" or lipsticks are sent directly to the customer to be packaged; more often, they go to the company's Assembly Department where the packaging is assembled, the product is inserted, and the whole package is boxed for shipment to the customer, ready for resale to retailers and consumers.  (Genziana aff't ¶ 4.)

4.      Timely shipment is a critically important factor in customer satisfaction, as customers have to meet delivery schedules for their retailers, and these schedules often are built into marketing campaigns.  The function of the Planning Department includes establishing what materials are needed and when they have to be in the warehouse in order for the product to be completed in time for shipment to the customer on schedule.  The function of the Purchasing Department is, by reference to

4853-0136-3714.1                                - 2 -

purchasing orders issued by the Planning Department, to identify the supplier for each ingredient, negotiate the price, purchase the item, and get it shipped to the warehouse in timely fashion.  The consequences of failure to have the ingredients on the premises in timely fashion include interruptions and delays in production, extra costs for expedited delivery, overtime labor costs to make up for earlier delays in productions, and delayed delivery to the customer.  (Genziana aff't ¶ 4; *see also*, deposition of Angela Hamilton, taken June 29, July 29, and August 17, 2007 [herein "Pltf. dep."] at 225-29.)

5.     During the time period relevant to this action, Intercos often purchased ingredients from its parent company in Italy, inasmuch as joint purchases enabled the company to realize economies of scale. This, in turn, required close cooperation between the purchasing departments of the related organizations. (Genziana aff't ¶ 6.)

6.     The most senior position at Intercos is the General Manager.  In 2001, when plaintiff was hired, John Chilton was the General Manager.  He was replaced by Paolo Valsecchi at some point later that year.  In January 2004, Valsecchi took a position with Intercos SpA in Italy, at which time Morena Genziana replaced him as General Manager.  As General Manager, Genziana reports directly to Dario Ferrari, the owner of Intercos SpA.  (Genziana aff't ¶ 7.)

7.     Ms. Genziana is the person who made the decision to terminate the plaintiff's employment, effective March 4, 2005.  (Genziana aff't ¶ 8.)

8.     Genziana started working for Intercos SpA in 1998.  Based in Italy, she was Director of Sales for the U.S. Market.  In September 2000, she was appointed head of the New York Sales Office and relocated to New York City.  Her title was

Executive Director, Marketing & Sales.  She became Vice President, Sales & Marketing

in September 2001.  When she became the General Manager in January 2004, she

retained the title of Vice President Sales.  She has offices in both Congers and the New

York City Sales office.  (Genziana aff't ¶ 9.)

## Genziana's Perceptions of Plaintiff Prior to January 2004.

9.      Plaintiff was hired in April 2001.  She had applied for and,

notwithstanding that she has no formal education beyond a high school diploma, was

hired as Master Scheduler in the Planning Department, with a salary of $68,000.  The

day she started, her boss was fired and she became the *de facto* head of planning.  Her

title was changed formally to Manager of Planning on July 1, 2001.  (Genziana aff't ¶ 10.)

10.      During Valsecchi's tenure as General Manager, plaintiff's salary was

increased to $76,000 in April 2002.  In August 2003 Valsecchi gave her responsibility

for the Purchasing Department, as well, at which time the planning and purchasing

functions were combined into a single department and plaintiff's salary was increased to

$80,000. When Genziana became the General Manager in January 2004, Valsecchi told

her that he had agreed to increase plaintiff's salary to $87,000 in 2004 and to include

her in the management incentive bonus plan.  Genziana honored that promise.

(Genziana aff't ¶ 11; *see also*, deposition of Morena Genziana, taken July 24, August 29,

and September 25, 2007 [herein "Genziana dep."] at 233.)

11.      However, on the basis of her observations of plaintiff's job

performance from 2001 to 2004, Genziana did not share Valsecchi's sympathetic view of

plaintiff's abilities as a manger.  (Genziana aff't ¶ 12.)

12.     Genziana had interviewed plaintiff before plaintiff was hired in April 2001. At that time, Genziana advised Chilton, then the General Manager, that she thought plaintiff's interpersonal skills were not right for the Master Scheduler job, or any other job that involved customer service. She also thought plaintiff was too defensive. Chilton hired plaintiff over Genziana's objection. (Genziana aff't ¶ 13.)

13.     In at least two meetings in 2001, Genziana told Valsecchi and Tony Raio, then the head of Human Resources, that she had concerns about plaintiff's interpersonal skills. They had been discussing problems in scheduling and production, and the question had arisen as to whether plaintiff was the right person to head the planning area. Genziana reminded them that she had opposed hiring plaintiff in the first place. (Genziana aff't ¶ 14.)

14.     There were many delivery problems that Genziana attributed largely to plaintiff. (Genziana dep. at 83-87.) However, when she told Valsecchi that the Planning Department was not being run properly, Valsecchi was protective of plaintiff, and told Genziana that they had to give her time. (Genziana aff't ¶ 16, 17; *see also,* Genziana dep. at 89-90.)

15.     Prior to the time she became General Manager, Genziana had observed, and had heard others comment upon, plaintiff's tendency to mistreat subordinates and co-workers and to blame others when asked about her own failures. (Genziana aff't ¶¶ 15, 18.)

## Plaintiff's Management Style

16.     Plaintiff's style as a supervisor and manager was to monitor her subordinates very closely when she thought they were not performing properly, to the

point that often they felt she was picking on them and hovering over them. She also had a tendency to scream at them when she was upset. Genziana was aware of these tendencies. (Genziana aff't ¶ 19.)

17.    For example, in September 2001, five employees complained to Human Resources about plaintiff's behavior and unprofessional conduct, including that she had "screamed" at them and made "pointed" comments. Plaintiff's explanation is that they were not using the inventory computer system correctly, and "it was necessary to be constantly after them to get the work done properly." By "constantly after them," plaintiff means that she "had to monitor their reports on a weekly basis and bring to their attention the errors." She also does not "deny that I've raised my voice." Raio issued her a formal written warning and said she "needed to tone it down." (Genziana aff't ¶ 20; *see also,* Pltf. dep. at 155-60 & affirmation of Dennis A. Lalli, dated December 9, 2007 ["Lalli aff."], ex. F.)

18.    Plaintiff also was the subject of a series of e-mails (of which Genziana was a recipient) in which Katee Degan, an Operational Marketing Executive ("OME"), took offense at plaintiff's blaming her publicly for an inventory problem that Degan believed was not her fault. Plaintiff's response was to be defensive and attack Degan's motives. (Genziana aff't ¶ 21; *see also,* Pltf. dep. at 163-70.)

19.    In November 2002, Ivan Pulgar, a temporary employee who had been working for plaintiff, resigned because she was screaming at him and monitoring him too closely, such that even plaintiff acknowledges that he felt that she "was hoarding over him" and "maybe picking on him." Plaintiff also acknowledges that "I tend to talk very loudly. I am not a very meek person. I am – I just have a very loud voice. I even had my hearing tested to see if it was because of my hearing, but I do talk

very loud and I have had people say, 'Why are you screaming?' And I just talk loud and it happens on the phone, too." (Pltf. dep. at 174-80; *see also,* Genziana aff't ¶ 22.)

20.    In August 2003, Debbie Wenzel, another of plaintiff's subordinates, asked to be transferred away from plaintiff's department because of "hostility/conflict" between her and plaintiff. Wenzel and plaintiff each regularly accused the other of "screaming." Plaintiff recalls that they did have at least one "screaming match" in the middle of the office. Although plaintiff declares that "I don't scream," she acknowledges that "I talk loud, and people often take that as screaming. I'm not a – I'm not someone who goes around screaming at the top of my lungs. I just talk very loud, and I also have a firm voice." Wenzel was transferred to a different department in October 2003. (Pltf. dep. at 210-21 & Lalli aff. ex. G; *see also,* Genziana aff't ¶ 23.)

21.    In October 2003, Deborah Randazzo, an employee who had worked under plaintiff's supervision for two weeks, resigned because of plaintiff's imposition of unreasonable expectations, refusal to train or provide her with needed information, and instruction to Randazzo refrain from contacting Wenzel for information she needed to perform her job. Randazzo characterized plaintiff as "unprofessional" and "difficult." (Pltf. dep. at 203-10 & Lalli aff. ex. H; *see also,* Genziana aff't ¶ 24.)

**Plaintiff's Job Performance from January to October 2004**

22.    As of January 2004, when Genziana became the General Manager, plaintiff was reporting to Tony Quartararo, Vice President of Operations, who in turn reported to Genziana. (Genziana aff't ¶ 25.)

23.    Genziana determined that many changes had to be made to the organization in order to bring it to profitability. Among those changes was the way

planning and scheduling were being done.  Specifically, she was very unhappy with the way the Planning Department was working.  (*See* Pltf. dep. at 238.)  Accordingly, in March, after many meetings in Congers with her own management staff (*see* Genziana dep. at 131-32), Genziana asked Roberto Dotti, the Planning Manager for Intercos SpA, to come to Congers and study the organization.  (Genziana aff't ¶ 26.)

24.    Dotti was highly critical of the Congers planning function.  One of the principal solutions he proposed was to separate the Planning Department from the Purchasing Department and remove plaintiff from Planning, leaving her with responsibility for the Purchasing Department only.  However, in order to justify plaintiff's salary, Genziana decided that plaintiff should be responsible for packaging, as well as purchasing.  This approach was included in the report Dotti prepared following his analysis.  The changes were implemented in May 2004.  (Genziana aff't ¶ 27 & ex. A, B; *see also* Pltf. dep. at 236-46.)

25.    Genziana regarded the removal of plaintiff's responsibilities in the area of planning as a demotion for plaintiff.  (Genziana aff't ¶ 28; *see also,* Genziana dep. at 231-32.)

26.    Following the May 2004 reorganization, plaintiff had a new job title (Purchasing  Packaging Development Manager) and job description.  (Genziana aff't ¶ 29; *see also,* Pltf. dep. at 247-48.)

27.    Prior to this reorganization, plaintiff had never reported to Genziana directly.  Genziana decided that rather than form opinions about plaintiff on the basis of what she had heard from others, it would be fairer to have plaintiff report to her directly, so that her opinions could be formed on the basis of first-hand experience.

In addition, Genziana did not trust the judgment of Quartararo, then the Vice President of Operations and plaintiff's immediate superior, whom Genziana thought had been excessively protective of plaintiff under Valsecchi's tenure as General Manager and whom Genziana was then planning to dismiss (but who resigned in July 2004, before he was dismissed). Accordingly, plaintiff's new position reported directly to Genziana, rather than through the Vice President of Operations. (Genziana aff't ¶ 30; *see also,* Pltf. dep. 247-48.)

28.    Once Genziana had removed plaintiff's responsibilities for planning from her, she charged plaintiff with organizing the Purchasing Department. She wanted plaintiff to create formal purchasing procedures, protocols for communicating with Genziana by means of regular written reports, and a structure for the department. She also wanted plaintiff to hire stronger people to work for her, and to reduce the amount of stress and turnover she seemed to cause in her subordinates. (Genziana aff't ¶ 31; *see also,* Genziana dep. at 201; Pltf. dep. at 262.)

29.    At the same time, Genziana told plaintiff that because of the disarray in the planning function, it was her (Genziana's) intent to focus on the new Planning Department for the remainder of 2004, and then to turn her (Genziana's) attention to the Purchasing Department at the start of 2005. (Genziana aff't ¶ 32; *see also* Pltf. dep. at 253-54, 265.)

30.    Throughout this period, Genziana continued to hear about problems plaintiff experienced in supervising her subordinates. In particular, there were ongoing disputes from January through May 2004 between plaintiff and Angela Rouse, a Raw Materials Buyer who was then reporting to plaintiff. Plaintiff believed that Rouse had made many mistakes, failed to meet deadlines, and had "let" many

things "slide." So she "constantly followed up" with Rouse, to the point that Rouse felt she was being subjected to excessively close supervision and being picked on. During a meeting with plaintiff and the Human Resources Manager, Rouse declared that plaintiff was picking on her and lying about the issues, and accused her of talking down to people. Rouse resigned on May 7, 2004 by means of a letter to Ferrari, the owner of Intercos SpA, in which she declared that she had heard plaintiff "yell and scream" at a supplier, and that plaintiff was "unbearable to work for or with," had engaged in "many screaming matches in the middle of the floor," and "seriously lacks management and interpersonal skills." (Pltf. dep. at 287-312 & Lalli aff. ex. I; *see also* Genziana aff't ¶ 33.)

## Genziana's Decision in October 2004 to Replace Plaintiff

31.    As of October 2004, plaintiff had reported to Genziana for three months. During that period, Monique Easton, the company's contact at Procter & Gamble ("P&G"), had advised Genziana that she was unhappy with plaintiff's work on their the packaging development and asked that plaintiff be completely removed from their packaging activities. (Genziana dep. at 169-71.) In addition, plaintiff's inability to train, manage, or get along with her subordinates had persisted, as illustrated by the Rouse resignation, as well as by her failure to delegate tasks that subordinates should have done. (Pltf. dep. at 272.) There also were many complaints about plaintiff from management personnel and plaintiff's counterparts at Intercos SpA in Italy. (Genziana aff't ¶ 34; Pltf. dep. at 335-37 & Lalli aff. ex. J; Pltf. dep. at 342-45 & Lalli aff. ex. J.)

32.    Perhaps most critically, plaintiff had failed to make noticeable progress in regard to Genziana's instructions to create a well-organized Purchasing Department. For example, Genziana had asked plaintiff to prepare a list of objectives for 2004. Plaintiff produced a single page of handwritten notes setting forth four goals

that even plaintiff regards as "way too general." Genziana was wholly unsatisfied with these goals, and wrote on the back of plaintiff's list a fifth goal: "Become a manager." (Genziana aff't ¶ 35; *see also* Pltf. dep. at 266-72 & Lalli aff. ex. K.)

33.     In early October 2004, Genziana decided that plaintiff should be dismissed.  She instructed Anne Hayden, the company's Controller, to contact an executive search firm to recruit a replacement.  Hayden did so, and the recruiter referred a number of candidates, many of whom were interviewed during the next several months.  (Genziana dep. at 167-69; deposition of Anne Hayden, taken September 25, 2007 ["Hayden dep."] at 60-64.)  In addition, Genziana reassigned certain duties regarding customs and import matters for which plaintiff previously had been responsible to Morena McCormack, who recently had been hired as the new warehouse manager.  (Genziana aff't ¶ 36; *see also,* Genziana dep. at 328-29; Pltf. dep. at 366.)

34.     Genziana did not fire plaintiff at that time because the department was understaffed, and she wanted to have a replacement hired before dismissing plaintiff.  (Genziana dep. at 168-69; Hayden dep. at 62.)  Genziana refrained from telling plaintiff about the decision to replace her because plaintiff was in charge of a $12 million budget (Pltf. dep. at 366); she thought it would be unwise to have a lame duck in charge of so much of the company's money.  (Genziana aff't ¶ 37.)

35.     In November 2004, Genziana interviewed Vance Raftopoulos, a candidate with impressive credentials in the area of packaging engineering but no experience in purchasing.  In order both to satisfy the request from P&G to have someone other than plaintiff work on their packaging development and to make room for a candidate she found to be very attractive, Genziana decided to (a) split plaintiff's

job, (b) create a new Packaging Engineer position, (c) hire Raftopoulos for that job, and (d) continue to look for someone new to replace plaintiff as Purchasing Manager. (Genziana dep. at 169-70.)  Raftopoulos accepted the job offer, but requested a start date in mid-January, to which Genziana agreed.  (Genziana aff't ¶ 38.)

36.    Thus, by the end of November 2004, plaintiff's responsibilities in the areas of planning and customs/import had been taken away, a replacement had been selected to assume her responsibilities in the area of package development, and the company had decided to replace her as manager of the Purchasing Department, the only area that was not yet either removed or scheduled to be removed from her.  All of these decisions had been made before plaintiff ever disclosed to Genziana or anyone else at Intercos that she had breast cancer.  Genziana aff't ¶ 39.)

**Plaintiff's Disclosure That She Had Breast Cancer**

37.    In early December 2004, Intercos was planning a conference with representatives of P&G at P&G's location in Hunt Valley, Maryland later that month. Genziana was to attend, together with David Consani (who was flying to New York from Italy on December 12) and six other people from Intercos, including plaintiff.  They were to drive to Hunt Valley.  (Genziana aff't ¶ 40.)

38.    Plaintiff,  however, said she had a personal emergency, and asked to participate by telephone.  Genziana approved this request.  Plaintiff then participated in the meeting by telephone.  (Genziana aff't ¶ 41.)

39.    This conference took place before plaintiff ever disclosed to Genziana that she had breast cancer and would need to take time off for related medical procedures.  Aside from this conference, only one other meeting between Intercos and

P&G took place in Maryland between December 1, 2004 and March 4, 2005, when plaintiff was discharged. That conference occurred on January 28, 2005; the only Intercos personnel who attended or whom it was ever contemplated would attend were Genziana, Dario Ferrari, and Paola Colombo. (Genziana aff't ¶ 42.)

40.     During the third week of December 2004, plaintiff's physician advised that results of the December 13 biopsy indicated that there were cancerous cells in her breast. He recommended a lumpectomy. (First Amended Complaint [herein the "Complaint"] ¶ 10.)

41.     Plaintiff promptly informed Maria Cruz, Manager of Human Resources, about her condition and her need for a week's leave of absence starting January 3, 2005 for the lumpectomy. (Complt. ¶ 10; *see also* Pltf. dep. at 130-31.) Cruz advised her to notify Genziana; she did so. (*Id.*) She was permitted to take her leave of absence without any impediment whatsoever – she was not asked to fill out any forms, and she received full pay during her absence. Genziana's response to her request for a medical leave of absence was that since the procedure was scheduled for the week when the entire company would be shut down for its annual inventory, the timing was good and that plaintiff need not worry. (Pltf. dep. at 130-31; *see also,* Genziana aff't ¶ 43.)

42.     Plaintiff was absent on January 3, 2005 for her lumpectomy, and remained absent for recovery through January 9, 2005, returning to work the next day. (Genziana aff't ¶ 44.) Neither Genziana, nor Hayden, nor anyone else from Intercos said or did anything prior to January 10, 2005 that plaintiff contends was part of any campaign of harassment against her (a) for exercising her right to take a medical leave of absence, (b) because she had breast cancer, or (c) because they perceived her as having a disability.

4853-0136-3714.1                            - 13 -

### Genziana Decides to Suspend Her Prior Decision to Replace Plaintiff

43.     The news that plaintiff had breast cancer struck a sympathetic chord in Genziana, as she has lost friends to breast cancer and has other friends who are breast cancer survivors who are still fighting this disease.  Some are former co-workers from when she worked at Intercos SpA in Italy.  (Genziana aff't ¶ 45; *see also*, Genziana dep. at 136-50.)

44.     Since Raftopoulos soon would coming aboard to take the responsibility for packaging development that previously had been plaintiff's, running the Purchasing Department was all that would be left of plaintiff's job.  Considering the sad news that plaintiff had just received, Genziana concluded that it would be inappropriate to dismiss her at that time.  Genziana therefore decided to suspend her prior decision to replace plaintiff as Purchasing Manager.  Instead, she decided to give plaintiff a second chance, to see whether she could demonstrate that she could meet the goals Genziana had set for her in regard to creating a formal Purchasing Department by the end of the first quarter of 2005.  (Genziana aff't ¶ 46.)

45.     Thereafter, Genziana did go forward with at least one interview for a new Purchasing Manager; that is, with Ed Zaccone, on January 12, 2005.  This was because the interview had been scheduled before plaintiff disclosed her condition to Genziana, and also because Genziana I did not have enough confidence in the prospect that plaintiff might succeed to believe that it would be a waste of time to go forward with the interview.  (Genziana aff't ¶ 47; *see also,* Pltf. dep. at 422-28.)

## The Events of January 10 Through February 16, 2005.

46.     Plaintiff's first day back at work following her January 3 lumpectomy was January 10, 2005.  She claims that upon her return, Genziana began to pressure her with work-related issues.  This, however, was true to and consistent with Genziana's prior statements to plaintiff that Genziana would focus on the Planning Department in 2004 and turn to the Purchasing Department starting in January 2005.  Plaintiff concedes that this was entirely appropriate.  (Genziana aff't ¶ 48; Pltf. dep. at 531-33.)

47.     On or about January 12, 2005, plaintiff learned that her first lumpectomy had been unsuccessful, and that she would have to undergo a second one, and concomitantly would need another week's leave of absence.  She told Genziana about her diagnosis and her need for the second leave of absence.  (Genziana aff't ¶ 49.)  Genziana "told [her] not to worry and that was the end of it."  There was no impediment to her taking the time off, and neither Genziana nor anyone else expressed displeasure at her need for the absence.  Genziana simply "went back to business as usual" and "was more concerned with me getting the tasks done that needed to be done."  (Pltf. dep. at 131-34.)  "She just cared about her reports and her tasks that she had given me and to make sure that it was done, and that's all she wanted."  (*Id.* at 142)

48.     Plaintiff alleges that from January 12, 2005, when she told Genziana she would need a second leave of absence, to February 10, when that leave started, Genziana and Hayden criticized her work performance, gave her work assignments with unrealistic deadlines designed to ensure failure, and treated her in an abusive and hostile manner, which consisted largely of "screaming" at her many times.  (Complaint ¶¶ 12-14.)

4853-0136-3714.1                                   - 15 -

49.     However, during this same period, a number of issues arose that warranted supervisory criticism and close monitoring. Many of these issues flowed from discrepancies that had surfaced during the annual inventory that was done during the week of January 3, while plaintiff was absent. These discrepancies revealed that a great deal of material had been purchased for which there never had been any use, and therefore which resulted in a write-off for 2004. The exact amount – over $500,000 – was not calculated until much later, but by the week after the inventory was over, Ms. Genziana had a fairly good idea that it was a large amount. (Genziana aff't ¶¶ 51, 52; Pltf. dep. at 472-73.)

50.     The inventory also revealed that there were some 144 items that the company should have had and thought it had, but did not have. (Pltf. dep. at 533-34.) The result was that materials had to be bought quickly (and hence at a premium). Moreover, the consequent delays almost required shutting the plant down and laying everyone off; they did, in fact, require Saturday work and overtime expenses for labor. (Genziana aff't ¶ 53; *see also* Genziana dep. at 182-98.) On February 18, 2005, plaintiff wrote to Simona Piras, her contact at Interocs SpA (Pltf. dep. at 542-43) that "[t]he fact Purchasing was able to go from 144 items not ordered to 139 in the past two or three weeks is not good enough to keep the plant functioning. We are still in 'critical mode' because we are getting deliveries later than Production required them to make the customer happy." (Pltf. dep. at 466-467.)

51.     Genziana regarded plaintiff as among those responsible for the inventory discrepancies because she was the Purchasing Manager. While this was only one of many reasons for the decision to terminate plaintiff's employment later on, it is worth noting that Genziana regarded Jack LoRe, Director of Logistics, as also

responsible for these discrepancies.  LoRe's employment was terminated shortly after plaintiff's; LoRe did not have any disability, and had not taken any FMLA-protected leaves of absence.  (Genziana aff't ¶ 54 & ex. C.)

52.      Plaintiff concedes that if Genziana believed that the inventory problems were plaintiff's fault, she would have ample reason to give plaintiff assignments with tight deadlines so that the raw materials and other items that had not been purchased would get to the plant in time, either to make the production schedule or at least to minimize delays.  (Pltf. dep. at 535.)  Plaintiff further concedes that if the inventory discrepancies were her fault, Genziana would have had ample reason to monitor her closely to make sure she was resolving them.  (*Id.*)  Plaintiff also concedes that the person in charge of a manufacturing company would be justifiably upset with any manager whom he or she believed was responsible for putting the production operation behind schedule.  (Pltf. dep. at 536.)

53.      Prior to the time plaintiff disclosed her breast cancer condition to Genziana, plaintiff had not thought tight deadlines were unfair.  In September 2004, Genziana sent plaintiff an e-mail the day before plaintiff was to return from a vacation expressing concern about a "disaster" that had arisen during plaintiff's absence and instructing her to attend to it when she arrived the next day, and also instructing her to complete certain other tasks within two days.  (Pltf. dep. at 345-52 & Lalli aff. ex. L.)  Plaintiff regarded these as unrealistic deadlines, but acknowledged that it was not unfair for Genziana to hold her responsible for problems that had arisen while she was away because as "as manager of the department, ultimately I'm responsible."  (*Id.* at 348.)

54.     Genziana believed that plaintiff was substantially to blame for the inventory discrepancies that were discovered in January 2005, and that those discrepancies had put the production operation behind schedule. (Genziana aff't ¶ 54.)

**February 17, 2005 Through Plaintiff's Discharge on March 4, 2005**

55.     Plaintiff returned to work on February 17, 2005, after a week's leave of absence to recover from her second lumpectomy, which was performed on February 10. She claims that on her first day back, Hayden informed plaintiff that Genziana wanted a report done by the following day that plaintiff believes ordinarily would take at least two days to complete. (Complt. ¶ 17; *see also,* Genziana aff't ¶ 55.)

56.     There was nothing unreasonable about this, however, since Genziana had requested this report *before* plaintiff took her medical leave of absence, and it could have been prepared by her staff in her absence. Moreover, plaintiff acknowledges that previously, she had submitted responsive information that was full of errors, and further that it was reasonable for Genziana to require correct information. And while plaintiff says that at the time Genziana gave her this assignment, Genziana "went berserk" when plaintiff told her how much work the job would entail, she also concedes Genziana "just wanted [the assignment]. When Morena wanted something she wanted it then and there, and it didn't matter how long it took. She didn't want to hear any excuses. She just wanted it." (Pltf. dep. at 39-42.) There is no allegation or evidence that Genziana wanted this report other than for wholly legitimate business-related reasons. In fact, the reason Genziana wanted the report the next day was, according to plaintiff herself, that there had been interruptions in production, shipments were not being made on time, and Genziana believed that the Purchasing

4853-0136-3714.1                                          - 18 -

Department was responsible for these interruptions, at least in part. (Genziana aff't ¶ 55; Pltf. dep. at 466; Genziana dep. at 342-43.)

57.     Plaintiff further alleges that on February 17, 2005, her first day back from her second surgery, Genziana instructed her to work on February 21, the President's day holiday. However, when plaintiff told Genziana that she did not want to work the President's day weekend, she did not allude to any health-related reasons. She said only that she wanted to take care of "my personal business. My pets, my house, myself." (Pltf. dep. at 526-28.) Genziana told her that the whole company was working Saturday that weekend, as it had been doing for a number of Saturdays during that period. Moreover, they agreed that plaintiff could take the Saturday off in return for her working the Monday holiday. (*Compare* Genziana aff't ¶ 57 *with* Pltf. dep. at 445-49.)

58.     Many weeks before February 19, 2005, Genziana had instructed plaintiff to provide a plan for a revamped Purchasing Department and to implement that plan by the end of the first quarter 2005. Genziana had followed up with plaintiff on February 7 and 18, 2005 to discuss her expectations. On February 19, 2005 she sent plaintiff a memorandum recapping their prior conversations to make it clear what she expected. Since plaintiff was now responsible solely for purchasing, and since they'd been discussing Genziana's expectations for months, she expected results. (Genziana aff't ¶ 56 & ex. D; Pltf. dep. at 473-82; Genziana dep. at 310-13; Complt. ¶ 19.)

59.     On Wednesday, February 23, 2005, plaintiff's physician told her she would need a mastectomy as soon as possible. Plaintiff claims she met with Genziana in Genziana's office that day and transmitted this information to Genziana, adding that she would need a leave of absence of six to eight weeks for the procedure. She did not, however, say when she would need the leave of absence. Genziana told

plaintiff to "take it easy." (Genziana aff't ¶ 58; Pltf. dep. at 144-46, 484-85, 507; Genziana dep. at 259-65.) Genziana neither said nor did anything that would indicate plaintiff could not take the required leave when the time came. (Pltf. dep. at 147-48.)

60.  Plaintiff's employment was terminated before her mastectomy was scheduled, and neither did she make a request for a leave of absence to start at any particular time, nor was a specific request for a medical leave of absence ever denied.

61.  Plaintiff alleges that after she told Genziana she would need a mastectomy and a concomitant leave of absence, Genziana subjected her to "constant abuse. It was constant yelling. It was constant interruptions, constant phone calls, even at my home. It was horrible, just absolutely, and unnecessary in so many cases. I didn't need to be told four times in a matter of half a day that I had a due date coming up." (Pltf. dep. at 150.) Plaintiff alleges further that Genziana told plaintiff to stop working past 8:00 p.m. in order to limit her work hours and thus prevent her from accomplishing her job. (Complt. ¶ 21; Pltf. dep. at 149.)  And Genziana supposedly was "constantly" giving plaintiff assignments on a daily basis, to the point that it was "frustrating . . . because I was struggling with all the interruptions constantly." (AH 508-50.) Plaintiff further claims that after she told Genziana she needed a mastectomy, she said she could not attend meeting with P&G in Maryland because of pain from having been "cut up" and Genziana became upset with her. (Pltf. dep. at 151-54.)

62.  However, it is not possible that Genziana "constantly" subjected plaintiff to "yelling" or "interruptions" after plaintiff told her she would need a mastectomy. They were not in the office at the same time enough for that to have happened. Plaintiff "is sure" she told Genziana that she would need a leave of absence on February 23, 2005, a Wednesday. However, she admits she did not go to work that

4853-0136-3714.1                         - 20 -

day.  Moreover, she visited doctors on Thursday, February 24, and is not sure she returned to work that day or whether she worked on Friday, February 25 or Saturday, February 26.  She missed work on Monday, February 28, when she went to visit a doctor in Manhattan for a second opinion, and on March 2, when she had a mammogram in Manhattan on that doctor's advice.  (Pltf. dep. at 491-508; Genziana dep. at 258-59.)  Thus, between February 23, when plaintiff says she told Genziana she needed a mastectomy, and March 4, when she was dismissed, she was at work no more than five days -- Friday, February 25, Saturday, February 26, Tuesday, March 1, Thursday, March 3, and Friday March 4.  Moreover, out of those five days, Saturday, February 26, 2005, is the only day when Genziana worked in Congers, having worked in New York City or traveled out of town on the others.  (Genziana aff't ¶¶ 59-62.)  One day was not enough time for Genziana to have subjected plaintiff to a "constant" barrage of "yelling" and "interruptions."

       63.    In addition, although plaintiff claims that Genziana was upset with her for not wanting to drive to Maryland for a meeting with P&G after she told Genziana she needed a mastectomy, there were no meetings between Intercos and P&G in Maryland during the period from February 17, when after plaintiff returned from her second lumpectomy, and March 4, the date of her discharge.  The only meeting with P&G to which plaintiff had been invited during the three months before her discharge was the one in December that she had declined to attend in person but in which she participated by phone.  That was before she had even told Genziana she had breast cancer, not after she said she needed a mastectomy.  (Genziana aff't ¶¶ 40 -42, 63.)

## Genziana's Decision to Terminate Plaintiff's Employment

64.     By March 1, 2005, Genziana had concluded that even though she had given plaintiff until the end of the first quarter of the year in which to provide a plan for a revamped Purchasing Department, it was fairly clear that plaintiff simply was not going to accomplish that goal and that her job performance was just too poor to warrant continuing her employment. Moreover, Genziana had covered for plaintiff's responsibilities in the Purchasing Department during plaintiff's absence from February 10-16, and concluded that she could discharge plaintiff's responsibilities herself on an interim basis without hiring a new Purchasing Manager. At that point, it was not a matter of whether plaintiff's employment should be terminated, but whether to permit her to continue to struggle through the end of March or to let her go earlier. On March 1, she began a memorandum to state the reasons for this decision. (Genziana aff't ¶ 64; Genziana dep. at 323-37.)

65.     Genziana had come to a similar conclusion the day before with regard to Jack LoRe, the Director of Logistics, for similar reasons. On February 28, she had begun drafting a memorandum to state her reasons for firing LoRe, and he was discharged the week after plaintiff. (Genziana aff't ¶¶ 55, 65 & ex. D; Genziana dep. 192-93, 406-410.)

66.     The conclusion that plaintiff's poor job performance warranted terminating her employment was the culmination of a large number non-exclusive factors, all of which contributed to this conclusion. They included plaintiff's "big mistakes" that had resulted in large losses for the company (Genziana dep. at 172, 173-90, 307-09); her inability to retain staff members (Genziana dep. at 212-13); her failure to prepare presentable reports (Genziana dep. 212-13); her lack of strategy in purchasing

(Genziana dep. at 214); her poor negotiation skills (Genziana dep. at 218-21); and her difficult interpersonal relations with other departments and suppliers. (Genziana dep. at 173; see also, Genziana aff't ¶ 66.)

67.    Prior to March 1, Genziana had remarked to Hayden on many occasions that she was unhappy with the results she was getting from plaintiff and felt that plaintiff was letting her down by failing to deliver the desired improvement. (Genziana aff't ¶ 67; Affidavit of Anne Hayden, sworn to December 8, 2007 [herein "Hayden aff't"] ¶ 4; Hayden dep. at 58-59; Genziana dep. at 241-42.)

68.    The "straw that broke the camel's back" was a dispute that Genziana learned about during the week of Monday, February 28, 2005. Hayden had informed her that the Purchasing Department and a French supplier called Luzenac were arguing about how much Intercos owed for a particular order. (Genziana dep. at 381-82; Pltf. dep. at 536.) The dispute involved the question whether the price for a particular purchase order was 61,000 Euros or 61,00 U.S. dollars. At the then-current exchange rates, the difference was around $20,000. (Hayden dep. at 54.) Genziana believed that plaintiff seemed to be taking the matter lightly and did not appear to appreciate the difference in value between Euros and U.S. dollars. (Genziana aff't ¶ 67; Hayden aff't ¶ 2.)

69.    Genziana remarked to Hayden that it was entirely unacceptable to have someone in charge of handling millions of dollars of the company's money make a mistake of that caliber and take it lightly. Since Luzenac supplies Intercos SpA as well as Intercos America, she asked Hayden to consult with several key people at Interco SpA and try to resolve the matter. She also told Hayden she was considering termination of plaintiff's employment. (Genziana aff't ¶ 68; Hayden aff't ¶ 3.)

4853-0136-3714.1                                    - 23 -

70.     On March 3, Hayden consulted with counsel, as is her custom when the company is contemplating the discharge of a management employee, to ascertain that discharging the plaintiff would not violate her rights.  When she was confident on the basis of counsel's advice that the discharge would be lawful, she then asked counsel to prepare a separation agreement in the event of the termination of plaintiff's employment. (Hayden aff't ¶ 5; Hayden dep. at 51-52; deposition of Maria Cruz Rosario, taken August 10, 2007, at 183.)

71.     On March 4, Hayden's efforts to resolve the Luzenac matter ended with the payment of 61,000 Euros, not dollars.  The payment was wired in U.S. money that day. (Hayden aff't ¶ 6.)

72.     Genziana learned the outcome of the Luzenac matter on the morning of March 4 in a telephone conversation with Hayden.  She decided that the time had come to terminate plaintiff's employment and instructed Hayden to effectuate the termination that day. (Genziana aff't ¶ 70; Hayden aff't ¶ 7; Hayden dep. at 48.)

73.     Hayden met with plaintiff and the Human Resources Manager at the end of that day and advised plaintiff that her employment was terminated. (Hayden aff't ¶ 8.)

## The Larger Context of Plaintiff's Discharge

74.     Plaintiff was not the only manager whose employment at Intercos ended during the period starting January 2004, when Genziana became the General Manager, and March 2005.  Genziana instituted a whole host of changes during this time.  And as a result of those changes, 2004 was the first year since the company started in which revenues exceeded costs. (Genziana aff't ¶ 72.)

75.    Some of these changes involved terminations of employment. As noted above, Jack LoRe was discharged the week after plaintiff, and two other managers were dismissed in 2005. Three managers also had been discharged in 2004. And five managers retired or resigned in this time frame, including Quartararo, whom Genziana was planning to dismiss at the time he resigned. However, eight other managers were promoted and/or saw substantial increases in the scope of their responsibilities. (Genziana aff't ¶ 73 & ex. G.)

76.    None of the managers whose employment was terminated involuntarily had any disability, nor had any of them taken a leave of absence protected under the FMLA. One of the managers who resigned, Ingrid Clark, did so after returning to work for several weeks following a maternity leave, but then informed Genziana that she wanted to stop working to stay home with her new baby. (Genziana aff't ¶ 74.)

77.    Moreover, at least one of the managers who were promoted, Paulyne Wang, had breast cancer and took time off for associated medical procedures; she is still employed. (Genziana aff't ¶ 75; Genziana dep. at 145-47.) Another current manager, Irene Muscalino, had breast cancer and took at least one leave of absence of more than two months. (Genziana aff't ¶ 75; Genziana dep. at 148-51) A former Quality Control employee, Sandra Vizcarra, had breast cancer and resigned without experiencing any adverse employment decisions. (Genziana aff't ¶ 75; Genziana dep. at 148.) Michelle DelValle, formerly a Human Resources Manager who resigned in January 2006, had advised Intercos that she had breast cancer at the time she was hired. (Genziana aff't ¶ 75; Genziana dep. at 142-45.)

78.    In addition to these employees who had breast cancer and suffered no adverse employment decisions, Genziana is aware of a number of managers who took lengthy leaves of absence for medical reasons without suffering any adverse employment decisions.  Silvia Bottegoni, who was promoted to be the Director of the New York Sales and Marketing Office, took two maternity leaves of absence; Don Piesco, the Facilities Manager, took a lengthy leave of absence for major surgery; Anne Hayden, the Controller, took a leave of absence for several weeks for a hysterectomy; and Ingrid Clark, the former Manager of Operational Marketing, took a maternity leave of absence. (Genziana aff't ¶ 76; Genziana dep. at 271-72.)

## Plaintiff's Experience in Regard to Leaves of Absence

79.    Prior to needing a leave of absence in January 2005 for a lumpectomy, plaintiff previously had taken leaves of absence for medical reasons during the week of February 23, 2004 and from June 6 through June 27, 2002.  No one from Intercos expressed any dissatisfaction about those leaves or impeded her ability to take them, or retaliated against her in any manner for taking them.  (Pltf. dep. at 124-126, 127-30.)

80.    Nor did anyone from Intercos express any dissatisfaction about plaintiff's need for one-week leaves of absence for her lumpectomies in January and February 2005 or impede her ability to take them.  (Pltf. dep. at 130-34.)

81.    Although plaintiff told Genziana that she would need a mastectomy that would necessitate a leave of absence of six to eight weeks, she never told anyone at Intercos when the procedure was to take place, nor did she ask to take a leave of absence to have the procedure done.  Nor did anyone say or do anything that would indicate that she would not be permitted to take the time off if she needed it.  (Pltf. dep. at 144-46;

484-85; 507; Genziana dep. at 259-65.) To the contrary, Genziana told plaintiff – who frequently worked late into the night and often complained about the hours she was working – that she was working late far too much and instructed her to stop abusing herself and not to work later than 8:00 p.m. (Genziana dep. at 266-71.)

### The Absence of Limitations on Plaintiff's Life Activities

82.    Plaintiff acknowledges that her breast cancer did not limit her ability to do her job. (Pltf. dep. at 400-09.) In fact, the only accommodation she ever requested was to be able to avoid having to work Saturday of President's day weekend or on the President's Day holiday. (Pltf. dep. at 526-28.) Although she did, in fact, agree to work the holiday in return for not working on the Saturday the rest of the plant would be working that weekend, plaintiff never said she needed the time off because of her medical condition. She said only that she wanted to take care of "my personal business. My pets, my house, myself." (Genziana aff't ¶ 57; Pltf. dep. at 526-28.)

83.    The are only two things that Genziana or Hayden ever said or did that plaintiff believes suggest that they believed her breast cancer limited her ability to engage in any activity. One was the instruction that was given to her on, she alleges, February 25, 2005, not to work past 8:00 at night. The other was Genziana's remark, supposedly made on January 25, 2005 after a lengthy discussion of the inventory problems in which plaintiff got frustrated, when in response to her frustration Genziana

allegedly said, "Could this be that you are preoccupied with your illness?"  (Pltf. dep. at

410-12.)

Dated:    New York, New York
          December 9, 2007

                              KAUFF McCLAIN & McGUIRE LLP


                              By: _____
                                      Dennis A. Lalli (DL-0575)

                                 950 Third Avenue, 14th Floor
                                 New York, New York  10022
                                 (212) 644-1010

                              Attorneys for the Defendant, Intercos America, Inc.

## CERTIFICATE OF SERVICE

Dennis A. Lalli, an attorney duly admitted to practice in this Court and the courts of the State of New York, hereby subscribes and affirms under the penalties of perjury that on this tenth day of December 2007, he served the plaintiff with foregoing Defendant's Statement Pursuant to Local Civil Rule 56.1(a) by causing a copy thereof to be delivered, by courier delivery in hand, to the offices of plaintiff's attorney, Elaine Smith, Esq., of the law firm Lewis, Clifton & Nikolaidis, P.C., located at 275 Seventh Avenue, 23rd Floor, New York, New York 10001-6708.

Dennis A. Lalli (DL-0575)